IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA FOR THE USE OF DONALD B. MURPHY CONTRACTORS, a Washington corporation;<br><br>     Plaintiff,<br><br>  vs.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation (Bond No. 041-SB-105826131; TRAVELERS INDEMNITY COMPANY, a Connecticut corporation (Bond No. 041-SB-105826131;<br>     Defendants,<br><br>KIEWITPHELPS, a joint venture;<br><br>     Defendant/Third-party Plaintiff,<br><br>  vs.<br><br>TREVIICOS SOUTH, INC.,<br><br>     Third-party defendant. | 8:15CV48<br><br><br><br><br><br>**MEMORANDUM AND ORDER** |

  This matter is before the court on the following motions: Treviicos South, Inc.'s, ("Trevi") motion in limine under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*") to exclude the opinions of Steve Stylos and John Elmer concerning the plaintiff's measured-mile analysis, Filing No. 117; KiewitPhelps' and Travelers

Casualty and Surety Company of America's ("Travelers")[1] motions in limine under *Daubert* to exclude the expert testimony of Robert Middour, Filing No. 119 and Filing No. 123; KiewitPhelps' and Travelers' motions to exclude the non-retained expert testimony of Bryce Niekamp, Paul Groneck, Craig Henke, and Steve Stylos, Filing No. 122 and Filing No. 125; KiewitPhelps' and Travelers' motions in limine under *Daubert* to exclude the expert testimony of John Elmer, Filing No. 127 and Filing No. 130; and KiewitPhelps' motion in limine to exclude the expert testimony of Paul Pederson, Filing No. 200.

I.  BACKGROUND

This case involves a large excavation in connection with construction of the federal government's Stratcom Facility Replacement Project at Offutt Air Force Base near Omaha, Nebraska (the "Project"). The United States Army Corps of Engineers ("USACE") entered into a construction contract for the Project with KiewitPhelps as the prime contractor. In compliance with the Miller Act, 40 U.S.C. § 3131(b)(2), KiewitPhelps furnished a payment bond, which names Travelers as surety, "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for use of each person." Trevi was the "earth retention and drilled shaft" subcontractor to KiewitPhelps and was responsible for constructing the Permanent Earth Retention Systems ("PERS") walls around the perimeter of what would then become the excavation. Trevi, subcontracted with Donald B. Murphy Contractors ("DBM") to install tiebacks to anchor Trevi's PERS walls in place.

---

[1] Because their interests are generally aligned and they have joined in each others' motions and briefs, KiewitPhelps and Travelers will sometimes be referred to collectively as KiewitPhelps.

This case involves competing construction-related claims for costs associated with delay and impact. DBM seeks recovery of its contract balance of approximately $2.1 million and the extra costs it incurred allegedly due to the conduct of KiewitPhelps and Trevi. KiewitPhelps has asserted claims against DBM relating to an alleged 53-day delay. KiewitPhelps is not only seeking direct costs, but also extended general conditions and costs that it alleges were incurred by several subcontractors that worked on the project.

DBM has quantified those costs using the "measured mile" method, which it contends is the preferred method for quantifying recoverable impact costs in the construction industry. DBM has identified Steve Stylos and John Elmer to testify as experts about the measured mile quantification method.

DBM contends KiewitPhelps had the duty to prevent surface water and groundwater from flowing into the excavation site. It contends the most common method of controlling water during construction is "dewatering." DBM retained Robert Middour to provide expert testimony on dewatering designs and to analyze KiewitPhelps alleged dewatering failures.

DBM has also disclosed that it intends to call Bryce Niekamp, Paul Groneck, Craig Henke, and Steve Stylos to testify as experts regarding construction scheduling, sources of water intrusion, and industry standards on maintaining a construction site in a suitable dewatered and unwatered condition. Those individuals are present or former DBM employees and are also fact witnesses.

Further, DBM has disclosed Paul Pederson as an accounting expert to testify with regard to pricing methodology and to analyze KiewitPhelps' alleged damages. Trevi and KiewitPhelps present *Daubert* challenges to the proposed expert testimony.

II. LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: "(1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003). Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id.* at 860. An expert's testimony should only be excluded where it is "so fundamentally unsupported that it can offer no assistance to the jury." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks omitted).

The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001). Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony, and the rule remains one of admissibility rather than exclusion. *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007). If there is doubt "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both

4

relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016). A trial court must be given wide latitude in determining whether an expert's testimony is reliable. See *Kumho Tire*, 526 U.S. at 152. This analysis requires that the court make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology . . . can be [properly] applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. Finally, as with all evidence, an expert's testimony's probative value must not be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

    Rule 701, however, is limited to situations where a witness is "not testifying as an expert." Fed. R. Evid. 701 It provides that a lay witness can give an opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* Rule 701 permits lay witnesses to "offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir.1990) (quoting *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir.1980)). "This rule, however, generally does 'not permit a lay witness to express an

5

opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.'" *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)).

"The distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Fed. R. Evid. 701 advisory committee's note to 2000 amendment (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)); *see also Range Road Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012) (quoting the same language). "Unlike a lay witness under [Federal] Rule [of Evidence] 701, an expert can answer hypothetical questions and offer opinions not based on first-hand knowledge because his opinions presumably 'will have a reliable basis in the knowledge and experience of his discipline.'" *Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (quoting *Daubert*, 509 U.S. 579, 592 (1993)).

The measured mile method of quantification, "like virtually every method of measuring lost productivity, appears to require the opinion of an expert." *Flatiron-Lane v. Case Atl. Co.*, 121 F. Supp. 3d 515, 543–44 (M.D.N.C. 2015) (noting that "[t]he point of the method is to compare what actually happened to a hypothetical universe where the defendant did not disrupt productivity"). The construction of hypothetical situations is the hallmark of expert opinion testimony under Rule 702. *See Sinkovich*, 232 F.3d at 203.

III. DISCUSSION

### A. Motions to exclude the testimony of Steven Stylos and John Elmer on measured mile quantification

Trevi and KiewitPhelps move to exclude the testimony of Steven Stylos and John Elmer regarding the measured mile quantification ("MMQ") of lost-productivity costs. They argue that Stylos's and Elmer's opinions are unreliable because Stylos and Elmer relied on incorrect and unreliable assumptions in arriving at their opinions, including that DBM's work on Level 1 was comparable to work DBM performed on Levels 2, 3, and 4. They also assert that Stylos and Elmer used incorrect assumptions that the lengths of the tiebacks installed on Level 1 were longer than those on the other levels. They also contend Stylos and Elmer failed to account for the difficulty of performing second shift work at night on Level 2, and used an incorrect number of weeks in concluding that DBM would have finished its work on time. In addition, they contend that the opinion of Mr. Elmer should be excluded because he did not conduct an independent analysis, but based his opinions on Stylos's analysis and/or the opinions of other DBM personnel without due investigation. Further, they argue that Stylos is not objective because, as a former DBM employee, his interests are clearly aligned with DBM's interests.

Elmer has an over forty years of experience in the area of Project Controls and Construction Management. He is President of John Elmer and Associates which provides construction dispute resolution services through claims preparation, negotiation, mediation, expert witnessing, contract administration, and Construction Management (CM) support services. He has a Master's degree in Business Administration and has expertise in scheduling, costing, contract administration, document control, and project and construction management. He is a member of the

American Association of Cost Engineers and has been retained to prepare or evaluate construction pricing for numerous construction projects. *See* Filing No. 140-8, Affidavit of John Riper ("Riper Aff."), Ex. 7, John Elmer Stratcom Expert Report at 16-19. He was disclosed as an expert and has furnished an expert report. *See id.*; *id.*, Ex. 14, DBM September 16, 2016, Expert Opinion Disclosure.

Steve Stylos also provided an expert report on measured mile quantification. He is an attorney and was employed by DBM as corporate counsel/risk manager until June 30, 2014. Since then he has been an independent contractor with DBM as his primary client. Since 2013, he has served as DBM's corporate secretary. He worked as an equipment operator/assistant operator, primarily on tieback projects from 1979 to 1984. Filing No. 140-21, Affidavit of Steve Stylos.

He has prepared claims using the measured mile technique since 1990 and has prepared at least ten claims using that method. He states he read a number of treatises on the measured mile technique. He has testified on at least three occasions and has been deposed at least ten times. He has never been disqualified as an expert witness. He has many years of experience participating in planning and management of tieback construction operations, assessing costs and cost impacts, and has an extensive background and experience with the measured mile cost method, having personally prepared numerous measured mile cost quantifications on different construction projects. Also, Stylos worked as an equipment operator on numerous DBM tieback projects. Filing No. 140-21, Affidavit of Steve Stylos.

The court finds that Stylos and Elmer are both qualified to testify as experts with respect to the measured mile quantification of lost productivity damages. Their

specialized knowledge will help the trier of fact to understand the evidence. Trevi's and KiewitPhelps' criticisms of their testimony go more to the weight than the admissibility of the evidence.

DBM has shown that the methodology has been widely accepted in the construction industry as a viable and reliable tool for measuring the impacts of isolatable causes to the productivity of construction. Stylos and Elmer have provided the basis for their opinions, including visiting the site, interviewing people, and reviewing literature, reports and documents connected to the Project. Both have extensive experience with construction claims. Elmer performed an independent evaluation based on his review of records and on interviews. Stylos has also shown that he made minor revisions to his Request for Equitable Adjustment (REA) in response to Elmer's suggestions.

Any alleged criticisms of the witnesses' methodology or assumptions can be pursued in cross examination. Similarly, the issue of Stylos's objectivity is properly the subject of cross-examination and is not a reason to exclude the testimony altogether. Stylos and Elmer appear to have ample support for the opinions they express. The record shows the witnesses have reviewed sufficient facts and data during their review of this case, the testimony is the product of reliable principles and methods, and they have reliably applied those principles and methods to the facts of the case. Accordingly, the court finds *Daubert* motions should be denied with respect to Stylos's and Elmer's MMQ testimony.

B. Motions to exclude testimony of non-retained experts Bryce Niekamp, Paul Groneck, Craig Henke, and Steve Stylos[2]

KiewitPhelps moves to bar DBM witnesses from testifying as experts on other designated topics such as contract scheduling issues, the contradiction between the look-ahead schedules that KiewitPhelps actually used to construct the project and the "baseline schedule," the origins and quantity of surface and ground water, industry standards, and whether KiewitPhelps could have maintained the site in a suitable dewatered and unwatered condition. It argues that DBM's expert designations for all of them are deficient as a matter of law because the expert "disclosures are an insufficient summary of the facts and opinions required of non-retained experts" under Federal Rule of Civil Procedure 26(a)(2)(C). Filing No. 125, Motion in Limine at 1.

The challenged witnesses are also fact witnesses. KiewitPhelps represents that its *Daubert* motion is not intended to address fact testimony. Filing No. 146, Reply Brief at 8. The record shows that those witnesses who DBM disclosed as both fact and expert witnesses were deposed and were questioned in both capacities. *See, e.g.*, Filing No. 126-7, Index of Evid., Affidavit of Jeremy Fitzpatrick, Ex. F, Deposition of Steve Stylos at 8-9. KiewitPhelps argues it should have been allowed to take a second deposition because the opinions were not disclosed. Filing No. 126-6, *id.*, Ex. E, Deposition of Craig Henke at 252 (renewing objection originally made at Stylos deposition that KiewitPhelps be entitled to a second deposition of individuals designated to serve as nonretained experts).

---

[2] KiewitPhelps' motion in limine with respect to Stylos is limited to the MMQ issue addressed above.

Bryce Niekamp has a degree in civil engineering and was DBM's project manager on the project. He is expected to testify to the quantities of water that entered through the tiebacks. In determining that it was possible to maintain the site in a suitable dewatered condition he performed an analysis involving calculating the amounts of water falling on the site due to rain and the amounts of water created by DBM's operations, and comparing that to the water KiewitPhelps was obligated to control and dispose. His analysis is based on civil engineering principles, his experience as a design engineer on earth retention systems, knowledge of industry standards and his review of documents and records. Filing No. 140-12, Index of Evid., Riper Aff., Ex. 11, Deposition of Bruce Niekamp.[3]

Paul Groneck is DBM Executive Vice President and Chief Operations Officer. He is expected to testify to the origins and quantities of surface and subsurface water that DBM contends Trevi and KiewitPhelps were contractually obligated to control and dispose of throughout the course of DBM's work. His opinion is based on his education—a Bachelor of Science degree in civil engineering—and his thirty years of experience in temporary shoring, permanent shoring, drilled shafts, earth retention, and foundations. Filing No. 140-11, Index of Evid., Riper Aff., Ex. 10, Deposition of Paul Groneck. He is also expected to testify with respect to the design of the anchor tendons and installation to meet the project specification requirements. His testimony with respect to water origin is based on his own observation. *Id.* at 107-08.

---

[3] KiewitPhelps contends the analysis has not been produced. If that is the case, Niekamp may be precluded from testifying about it. The court will address the issue at trial.

Craig Henke is DBM's general superintendent. He has over thirty years of experience in tieback installation. [Filing No. 140-10](), Index of Evid., Riper Aff., Ex. 9, Deposition of Craig Henke. He is also expected to testify to the origins and quantities of surface and subsurface water. [Filing No. 140-15](), Index of Evid., Riper Aff., Ex. 14, DBM's September 16, 2016 Expert Opinion Disclosure. At his deposition he testified to the effects of water incursion on the project. [Filing No. 140-10](), Henke Dep. at 60-61. DBM contends it does not intend to elicit the facts of KiewitPhelps' contract obligations through Henke's testimony. [Filing No. 139](), DBM Brief at 32. It concedes that Henke understood the responsibility for dewatering rested with KiewitPhelps, but Henke was never designated as an expert to prove that point. *Id.*

The court finds that KiewitPhelps' motion to exclude the testimony of Bryce Niekamp, Paul Groneck, and Craig Henke should be denied at this time without prejudice to reassertion via timely objection at trial. The witnesses' opinions appear to be based on their education and experience as well as their own perceptions. Groneck and Niekamp are civil engineers and their opinions are based on engineering principles. Henke has extensive experience on the construction methods and processes at issue. They are also fact witnesses entitled to testify to opinions rationally based on their perception.

The court is unable to assess KiewitPhelps' objections to some portions of these witnesses' testimony in the context of a motion in limine. The court cannot determine at this juncture whether the opinions are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," so as to be admissible as opinion testimony by a lay witness under Federal Rule of Civil Procedure 701. In the context of

a motion in limine, the court is unable to determine the distinction between testimony that may be proper as lay opinion testimony and testimony that is only appropriate as expert testimony. The witnesses may be qualified to express opinions as experts on some topics and as lay witnesses on others.

At this time, it appears that the *Daubert* objections go more to the weight than to the admissibility of the witnesses' testimony, subject to a proper showing of foundation and reliability. Whether the opinions satisfy *Daubert's* reliability requirements can be determined in a voir dire outside the presence of the jury if appropriate. The sufficiency of the opinions and the weight to be accorded them are matters for the jury to determine. The court will properly limit the experts' testimony to matters that would be helpful to the jury and are within the experts' area of expertise.

The court rejects KiewitPhelps' claim of unfair surprise because the record shows it had an opportunity to depose the witnesses knowing that DBM had designated them as experts. Moreover, it did not move to compel any additional depositions. Let it suffice to say the witnesses' testimony will be limited to opinions that have been disclosed in expert designations, expert reports, or deposition testimony.

          C.      Motions to Exclude the Testimony of Robert Middour

DBM seeks to offer the expert testimony of Robert Middour on the topic of dewatering, including developing conceptual approaches for dewatering the site and also analyzing the dewatering system that was designed by KiewitPhelps. Filing No. 142-1, Index of Evid., Affidavit of Robert Middour ("Middour Aff."). His testimony is based on conceptual models he created for adequately dewatering inside the excavation, for controlling groundwater outside the PERS wall, and for controlling

groundwater both inside and outside the PERS wall.  *Id.*  Middour is also expected to testify to his analysis of the eight well dewatering system designed and used by KiewitPhelps.  *Id.*

Middour is a licensed Geologist/Hydrogeologist with over 22 years of experience in dewatering, including designing dewatering systems and consulting on numerous groundwater control projects.  *Id.*, Ex. A, Resume.  Middour has a Master of Science degree in hydrogeology from the University of Idaho and a Bachelor of Science degree and Master of Science degree from Pennsylvania State University.  *Id.*  His opinions, as well as the information he relied on and the methodologies he used are set forth in his report.  *Id.*, Ex. B, expert report.

KiewitPhelps and Travelers assert that his proposed expert opinions do not meet the requirements of admissibility under *Daubert* because, with respect to the first model addressing "external" dewatering to be performed outside the perimeter of the construction site, Middour failed to account for the Missouri River, and its potential impact on the water table and did not perform testing to confirm the design would work. With respect to the second model, addressing internal dewatering, KiewitPhelps argues the model is irrelevant because Middour failed to evaluate the actual internal dewatering system used by KiewitPhelps at the project.

KiewitPhelps' and Travelers' criticisms of Middour's methods and opinions go more to the weight than to the admissibility of the testimony.  Middour is a hydrogeologist and his opinions are grounded in principles of hydrogeology.  Those principles are standard, accepted hydrogeology principles, and Middour's opinions have sufficient bases in fact.  The record shows Middour's opinions were based on

14

information relating to the ground conditions, such as: aquifer type(s) and properties; aquifer depth and thickness; distance of influence and aquifer boundaries; and initial groundwater level contained in the documents he reviewed including the December 13, 2010 Geotechnical Exploration Report. The record also shows that Middour considered the effects of the Missouri River in designing his models and that he evaluated KiewitPhelps' dewatering systems. [Filing No. 142-1](), Middour Aff. at 1-5. He asserts he performed no testing because he relied on the testing performed in the 2010 Geotechnical Report.

The court finds that Middour is qualified to testify as an expert. He has advanced degrees in hydrogeology and soil science and relied on the principles of those disciplines. Middour's methodology "fits" the facts of the case and the court finds the proffered testimony will be helpful to the jury. The record shows that he is qualified to testify to the opinions contained in his reports and those opinions satisfy *Daubert's* reliability requirements. The criticisms of his testimony go more to the weight than to the admissibility of the evidence. KiewitPhelps' and Travelers' concerns can be addressed in cross-examination. The sufficiency of the opinions and the weight to be accorded them are matters for the jury to determine. Accordingly, the court finds the motions in limine to exclude the testimony of Robert Middour should be denied.

        D.      Motion to Exclude the Testimony of Paul Pederson

KiewitPhelps challenges Paul Pederson's testimony and opinion on contractual interpretation. It contends Pederson's opinions are built on DBM's view of its "contractual responsibility" and Pederson's "observation" regarding the existence or

non-existence of supporting documentation, and argues the opinions should be stricken as invading the province of the court and the jury. Further it seeks exclusion of Pederson's "opinions about confusion or the need for information or uncertainty about documents" as relating to credibility which is a matter reserved to the jury.

DBM argues that KiewitPhelps misrepresents or misunderstands Pederson's opinions and contends that any statement in his report relating to contractual liability are merely comments regarding Pedersen's understanding of DBM's position on the issue. DBM represents to the court that it does not intend to offer testimony from Pedersen opining on the parties' contractual liability. It thus appears that KiewitPhelps' motion is, for the most part, moot.

Paul Pederson is a Certified Public Accountant. He has over thirty-six years of experience in providing litigation support and forensic accounting services. He has been retained by numerous contractors to work on construction-related litigation claims relating to allegations of delay and impact similar to the claims between these parties. He states:

> Because construction claims consist of specialized damages that are based on various costing methods unique to the construction industry, it is common for the parties to a construction dispute to retain CPAs to analyze and provide opinions regarding the other party's claims. These opinions typically include analyzing the methodology that the party applied when calculating its damages and then analyzing the evidence supporting the amounts to determine if they are properly substantiated.

[Filing No. 206-1](), Affidavit of Paul Pederson at 2. He was retained to analyze the claims submitted by KiewitPhelps relating to an alleged 53-day delay. KiewitPhelps seeks costs it alleges were incurred by several subcontractors that worked on the project, as well as direct costs. DBM intends to call Mr. Pederson to offer expert testimony relating

to the costing methodology KiewitPhelps used, the items it elected to include and exclude, and to provide analysis as to whether or not the documents and other evidence offered by KiewitPhelps substantiate the claimed amounts of KiewitPhelps' alleged damages.

In performing his analysis Mr. Pederson relied on general accounting principles and 36-years of experience analyzing construction claims. He performed an objective analysis of KiewitPhelps' claims and the underlying supportive documentation. DBM contends that, given the technical nature of construction delay claims, this is a specialized and technical analysis, not a simple clerical process for lay witnesses. It appears the analysis falls outside the purview of knowledge of the average juror and will be helpful to the trier of fact.

The court is unable to evaluate KiewitPhelps' argument that Pederson's testimony goes to credibility without hearing the evidence. KiewitPhelps appears to contend that "Pederson's ultimate opinion that KiewitPhelps' damages claim 'should not be relied upon'" is based on "Pederson's own subjective opinion regarding the weight of the evidence supporting KiewitPhelps' claim." Filing No. 201, Brief. This matter can be addressed in a proffer at trial. At this stage, the court finds that KiewitPhelps' *Daubert* motion with respect to Pederson's testimony should be denied without prejudice to reassertion at trial.

Accordingly,

IT IS ORDERED that:

1. Treviicos South, Inc.'s, motion in limine (Filing No. 117) is denied.

2. KiewitPhelps' motion in limine (Filing No. 119) is denied.

17

3. Travelers Casualty and Surety Company of America's motion in limine ([Filing No. 123](Filing No. 123)) is denied.

4. KiewitPhelps' motion in limine ([Filing No. 122](Filing No. 122)) is denied, without prejudice to reassertion.

5. Travelers Casualty and Surety Company of America's motion in limine ([Filing No. 125](Filing No. 125)) is denied, without prejudice to reassertion.

6. KiewitPhelps' motion in limine ([Filing No. 127](Filing No. 127)) is denied.

7. Travelers Casualty and Surety Company of America's motion in limine ([Filing No. 130](Filing No. 130)) is denied.

8. KiewitPhelps' motion in limine ([Filing No. 200](Filing No. 200)) is denied, without prejudice to reassertion.

Dated this 30th day of June, 2017.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge